## PIERRO v. CARNEGIE-ILLINOIS STEEL CORP.

### No. 10254.

United States Court of Appeals Third Circuit.

Argued Oct. 20, 1950.

Decided Dec. 26, 1950.

Hymen Schlesinger, Pittsburgh, Pa., for appellant.

Ira R. Hill, Pittsburgh, Pa., for appellee.

Before BIGGS, Chief Judge and KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

This action was commenced pursuant to the Jones Act, 46 U.S.C.A. § 688, to recover damages for the death of James Pierro suffered by the plaintiff, his widow, and their children. The plaintiff lost her case below on the jury's verdict and her alternative motions for a new trial or for judgment were denied by the trial judge. She now appeals asserting prejudicial errors in the instructions given to the jury with respect to negligence and causation and to the fitness of her husband for the work he was then performing.

James Pierro had been in the employ of the defendant for upwards of five years as a fireman on various of its vessels. He had a good record. At the time here involved, he was head fireman on the defendant's steamer, James L. Perry, which, with her tow, plied the Monongahela River to and from her home port at Clairton, Pennsylvania. He had the midnight and noon watches, each of six hours duration, with six hours of rest between.

On Sunday, February 29, 1948, at 6 A.M., The James L. Perry was traveling down river toward Clairton. Pierro finished his regular watch, which had begun at midnight, and retired. Perhaps fifteen minutes before 8 A.M., the fireman on the alternate watch, one James Hunter, reported ill and requested permission of the Master to leave the vessel at Lock No. 5, Brownsville, approximately thirty miles from Clairton. As a consequence, Pierro was awakened by one of the officers, and he proceeded to complete Hunter's watch.

Hunter left the vessel at 8 A.M. at Lock No. 5. The Master called the Clairton office and arranged for another fireman to board The James L. Perry at 3:45 P.M. that afternoon when she would reach Clairton. Pierro completed Hunter's watch at noon; he ate, and then returned to stand his own regular noon-to-six watch. In the meantime, the vessel arrived at Clairton on schedule at 3:45 P.M., Hunter's replacement was taken aboard and eventually The James L. Perry was turned around for her

trip back up the river. Pierro finished his watch at 6 P.M., and retired. In due course, after his six hours of rest, Pierro assumed his midnight watch. However, at 1:15 or 1:20 A.M. (Monday, March 1), he collapsed into unconsciousness.

Pierro's co-worker summoned the aid of licensed officers. A blanket was wrapped around him; he was made as comfortable as possible; and artificial respiration was administered. The Master, who was called from bed, reached Pierro about ten minutes or so after his collapse. He did not order any different treatment, but he did direct that the tow be tied up at Frick's Mine, which was the vessel's position about that time, and ordered that The James L. Perry return to Lock No. 5, which had been passed at about 12:55 A.M. From Lock No. 5, a police ambulance took Pierro to the nearby Brownsville Hospital, but upon arrival, Pierro was pronounced dead. How soon Pierro died after his collapse was one of the issues contested below, as was the cause of his death.

At this point it becomes pertinent to state that the United States Coast Guard had issued for The James L. Perry an inspection certificate specifying, inter alia, that a minimum of four firemen be in her service and on board when she is operated, as she was here, on a twenty-four hour schedule. The certificate requirements are implemented in 46 U.S.C.A. § 222.[1]

The plaintiff submitted to the trial judge a request[2] to instruct the jury that the Master was guilty of negligence because he admittedly operated The James L. Perry with a "short crew" on Sunday, February 29, 1948, between 8 A.M., when fireman Hunter left the vessel at Lock No. 5, until 3:45 P.M. that afternoon, when his replacement came aboard at Clairton. This request was denied. Upon the conclusion of the charge to the jury, the plaintiff excepted to the failure of the court to give a peremptory instruction of negligence. It was also asserted that she was entitled to the benefit of a presumption not merely of negligence, but of causation as well, and that the jury should have been so advised. The charge with respect to contributory negligence was objected to on the ground that no such issue was involved. Finally, the plaintiff objected to the instruction, given on the defendant's request, to the effect that Pierro

1. "§ 222. Complement of officers and crew of vessels; penalties

"No vessel of the United States subject to the provisions of title 52 of the Revised Statutes or to the inspection laws of the United States shall be navigated unless she shall have in her service and on board such complement of licensed officers and crew including certificated lifeboat men, separately stated, as may in the judgment of the Coast Guard be necessary for her safe navigation. The Coast Guard shall make in the certificate of inspection of the vessel an entry of such complement of officers and crew including certificated lifeboat men, separately stated, which may be changed from time to time by indorsement on such certificate by the Coast Guard by reason of change of conditions or employment. * * *

"If any such vessel is deprived of the services of any number of the crew including certificated lifeboat men, separately stated, without the consent, fault, or collusion of the master, owner, or any person interested in the vessel, the vessel may proceed on her voyage if, in the judgment of the master, she is sufficiently manned for such voyage: *Provided,* That the master shall ship, if obtainable, a number equal to the number of those whose services he has been deprived of by desertion or casualty, who must be of the same grade or of a higher rating with those whose places they fill. If the master shall fail to explain in writing the cause of such deficiency in the crew including certificated lifeboat men, separately stated, to the Coast Guard within twelve hours of the time of the arrival of the vessel at her destination, he shall be liable to a penalty of $50. If the vessel shall not be manned as provided in this section, the owner shall be liable to a penalty of $100, or in case of an insufficient number of licensed officers to a penalty of $500."

2. Plaintiff's Request No. 1: "The Captain knew that the crew was short one fireman, which is less than the minimum number of four firemen prescribed in the certificate issued for the Steamer, 'J. L. Perry' by the U. S. Coast Guard. The Captain was therefore guilty of negligence in continuing the operation of the vessel. The boat should have been tied up pending the arrival on board of a replacement for Hunter, the fireman who left the vessel because of illness."

impliedly warranted his physical and mental fitness for the position he assumed.[3] Such is the substance of the plaintiff's appeal, since the District Judge did not sustain her views.

The plaintiff's request for a peremptory instruction of negligence, as above stated, was properly denied. Manifestly, insofar as it was based upon the requirements of the certificate and statute, the request assumed a violation occurred in the operation of the vessel with only three firemen aboard. However, the statute authorizes a Master to exercise his judgment to continue the voyage. Under the circumstances of this case, whether the Master here exercised a reasonable judgment in proceeding to his home port is not a question which, in our opinion, can be answered as a matter of law. Rather, it is properly a matter for the trier of fact in the first instance.

This conclusion, however, discloses the error of the District Court, for the statute and the issue raised by it, of whose relevancy and influence in the case we have no doubt, were not submitted to the jury. Such omission we believe to have been prejudicially erroneous. And the fact that the plaintiff did not accurately request that the statute and issue be submitted to the jury does not make the error unavailable to her on appeal. Albeit the plaintiff's request was erroneous, it was, together with the exceptions taken, unmistakable in its direction. It was sufficiently specific to direct the attention of the Court to the issue it sought to raise, and the exceptions were definite enough to point out the omission from the charge. No more was required. Green v. Reading Co., 3 Cir., 1950, 183 F.2d 716, 719.

It may be assumed that under Section 222, should a jury find a Master to have exercised his judgment unreasonably, it would also justifiably conclude that he was negligent. Therefore, when the statute is in fact violated, a peremptory instruction would detract but little from the defendant's case. The requested presumption of causation, however, goes much beyond that. The special presumption relied upon by the plaintiff is a function in admiralty, effective to shift the burden of going forward with the evidence, used in the technique for determining fault of vessels involved in disasters.[4] It is not directly derived from any statute, but is a product of a philosophy peculiar to United States admiralty law, that disasters are likely to occur when statutes passed for the express purpose of promoting safety in navigation are violated. We do not consider such a presumption appropriate to the instant controversy.[5]

---

3. Defendant's Request No. 7: "Where a seaman enters into a contract of service there is an implied warranty that he is fit, bodily and mentally, for the station for which he contracts."

4. The usually quoted source of the presumption is The Pennsylvania, 1873, 19 Wall. 125, 136, 22 L.Ed. 148. See Robinson on Admiralty, pp. 796–797 (1939).

5. For the historical application of the presumption, see Griffin on Collision, §§ 25, 200–203 (1949), and 4 Benedict on Admiralty, p. 267 (6th ed. 1940), and 1950 Supp. thereto.

The express purpose of 46 U.S.C.A. § 222 is that of promoting "safe navigation", upon which standard the Coast Guard is required to exercise its judgment in determining the "necessary" complement of a vessel's crew and officers. "But the provision, fundamentally, is a measure of precaution against those perilous and often unexpected emergencies of the sea when only immediate and wakeful readiness for action may avert disaster or determine the issue between life and death; its effect as a regulator of working conditions is a matter of subordinate intent. * * * It is not unreasonable to conclude that Congress determined that each of the watches, like the crew as a whole, should be 'adequate in number,' competent and in a state of readiness 'for any exigency that is likely to happen'—such as a collision, the striking of the ship upon a reef of rocks or an iceberg, the sudden breaking out of fire, and other happenings of like disastrous tendency * * *." O'Hara v. Luckenbach S.S. Co., 1926, 269 U.S. 364, 368, 370, 46 S.Ct. 157, 158, 70 L.Ed. 313, although speaking of § 2, Seaman's Act of March 4, 1915, 38 Stat. 1164, now in 46 U.S.C.A. § 673 the Court referred to R.S. § 4463, the forerunner of the present 46 U.S.C.A. § 222.

■■ Finally, we agree with the plaintiff that it was error to instruct the jury that the decedent, by accepting the position of fireman, warranted his physical and mental fitness to do the work. The charge was unsuited to the long record of good work and good health of the decedent, of which his employer, the defendant was obviously aware. But more than that, our decision in Lindquist v. Dilkes, 3 Cir., 1941, 127 F.2d 21, rejects the warranty theory in maintenance and cure cases. Nor did our decision in Potter Title & Trust Co. v. Ohio Barge Line, 3 Cir., 1950, 184 F.2d 432, hold to the contrary. See also Ahmed v. United States, 2 Cir., 1949, 177 F.2d 898.

The plaintiff's remaining point on this appeal, concerning the charge on contributory negligence, we find to be without merit. But for the reasons already given, the judgment of the District Court will be reversed, and the cause remanded for a new trial.